James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile: (808)249-0668
Email:  jfosbinder@iff-law.com

Attorneys for Plaintiffs
JOHN S. COOPER,
HELENA K. COOPER, and
PETER MALCOLM COOPER

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 1 1 2011

at 11 o'clock and 15 min. A M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| JOHN S. COOPER,<br>HELENA K. COOPER, and<br>PETER MALCOLM COOPER,<br><br>               Plaintiffs,<br><br>v.<br><br>BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATE HOLDERS OF THE CWALT, INC. ALTERNATIVE LOAN TRUST 2007-HY6 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-HY6; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; MAX DEFAULT SERVICES CORP.; AND DOES 1 THROUGH 50 INCLUSIVE,<br><br>               Defendants. | Civil No. CV 11 00241 LEK RLP<br><br>COMPLAINT; EXHIBITS "1" – "5"; DEMAND FOR JURY TRIAL; SUMMONS |

1

## COMPLAINT

Plaintiffs JOHN S. COOPER, HELENA K. COOPER and PETER MALCOLM COOPER, ("Plaintiffs"), by and through their attorney, JAMES H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a Limited Liability Law Company, bring the following Complaint and allege and aver as follows:

## JURISDICTION AND VENUE

1.   Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction); the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq.; the Clayton Anti-Trust Act, 15 U.S.C. § 15 et seq.

2.   Jurisdiction also arises under 28 U.S.C. § 1332 (Diversity Jurisdiction).

3.   This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawaii Revised Statutes (hereinafter "HRS") by virtue of pendent jurisdiction.

4.   Venue is proper in the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawaii,

the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

5.    Plaintiffs are, and at all relevant times were, over the age of eighteen and residents of the State of California.

6.    Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is, and at all relevant times herein, was a corporation organized and existing under the laws of the State of Delaware, with its corporate headquarters in Reston, Virginia, and is a wholly owned subsidiary of MERSCORP, Inc. ("MERSCORP").  MERS operates an electronic registry designed to track servicing rights and ownership of mortgage loans in all fifty states in the United States. On information and belief, MERS has no authority to conduct business in Hawaii. Its registration with the Hawaii Department of Commerce and Consumer Affairs expired January 3, 2010, and has not been renewed to date.

7.    Defendant BANK OF NEW YORK MELLON ("BONY") FKA BANK OF NEW YORK, is, and at all relevant times herein was, a nationally chartered bank with its principal executive offices located in the State of Ohio.  BONY provides a range of financial services including, *inter alia*, lending and depository services, cash management, foreign exchange and trust and investment management

services.   Defendant  BONY  is  the  Trustee  for  THE  CERTIFICATE HOLDERS  OF  THE  CWALT,  INC.  ALTERNATIVE  LOAN  TRUST  2007-HY6 MORTGAGE   PASS-THROUGH   CERTIFICATES,   SERIES   2007-HY6   (the "Trust"), pursuant to a Pooling and Servicing Agreement ("PSA"), dated as of June 1, 2007, with a Trust Closing Date of June 29, 2007.   Relevant   portions   of   the   PSA   are   attached   hereto collectively as *Exhibit 1*, and the documents filed with the Securities and Exchange Commission are public and may be viewed online.[1]   Pursuant to the PSA, Alternative Loan Trust 2006-23CB is a common law trust formed under the laws of the State of New York. Its "Depositor" is CWALT, Inc., a Delaware corporation, a limited-purpose   finance   subsidiary   of   Countrywide   Financial Corporation,  4500  Park  Granada,  Calabasas,  California  91302. CWALT  served  as  "Depositor"  and  was  an  "Issuer"  of  the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR § 230.191.

8.   Defendant   MAX   DEFAULT   SERVICES   CORPORATION   (Max Default) is a corporation organized under the laws of the State of California, doing business in, and accepting the benefits of the laws in the State of Hawaii.

---

[1]   Pooling and Servicing Agreement dated as June 1, 2007, ALTERNATIVE LOAN TRUST 2007-HY6 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-HY6, at http://www.sec.gov/Archives/edgar/data/1402755/000090514807004996/efc7-1914_ex991.htm

9.    Defendants DOES 1-50, inclusive, are individuals, partnerships, corporations, associations or any other entity claiming any legal or equitable right, title, estate, lien, or other interest in the Subject Property.  Plaintiff reserves the right to amend this Complaint to add any such party as described in this paragraph as such party's identity is ascertained through discovery or otherwise.

## ECONOMIC BACKGROUND TO THIS COMPLAINT[2]

**Traditional Role of Banks**

10.   The role of banks has changed dramatically in the last two decades.  Since the 1930s, residential mortgages were conventional products: long-term, fixed-rate, "prime" mortgages, meaning the underwriting criteria were strictly followed.  The borrower was credit-worthy, he or she had the income to repay the debt, and the value of the real property sufficiently protected the lender in case of default.  Banks had a vested interest in ensuring that the loans they made were sound products and that borrowers can and would repay the loans because banks either held on to the loans they made or sold them on the secondary market to Fannie Mae and Freddie Mac, which were sponsored by the federal government to provide liquidity in

---

[2] The economic processes that have given rise to this Complaint involve complex financial schemes and esoteric terminology.  For this reason, Plaintiff respectfully requests that this Court allow general background information in order to clarify the economic reality of these financial arrangements.

the housing market. These entities had strict "conforming" standards for the loans they were allowed to buy.

11. In 1993, there were only 24,000 subprime mortgages (where the borrower does not meet standard underwriting criteria) used to purchase homes, with 80,000 subprime refinance loans. Prime purchase mortgages numbered 2.2 million, and 5.2 million prime refinance loans. In other words, there were 70 prime loans for every subprime loan.[3]

## Securitization and Mortgage-backed Assets

12. In 1968, Ginnie Mae began securitizing mortgages, that is, buying mortgages from lenders, combining them into pools, and issuing securities backed by these mortgage pools. These "mortgage-backed securities" (MBS) each had a claim to a small piece of each mortgage. The risk of default of one loan was spread over the large numbers of investors. The U.S. government, through Ginnie Mae, guaranteed the principal on the mortgages.

13. The Secondary Mortgage Market Enhancement Act of 1984 laid the way for present-day securitization by sidelining the

---

[3] Simon Johnson and James Kwak, "13 Bankers: The Wall Street Takeover and the Next Financial Meltdown" (2010), at p. 127, citing HDMA data gathered by the Federal Financial Institutions Examination Council, matched with the HUD list of subprime lenders; cited in Kenneth Temkin, "Subprime Lending: Current Trends and Policy Issues," The Neighbor_Wors Journal, Spring-Summer 2000, available at http://knowledgeplex.org/kp/text_document_summary/article/relfiles/partner_content/nrc/ht_nrc_temkin.pdf.

tax and state regulations that previously prevented banks and other entities from doing so. Investment banks could now buy mortgages, pool them, and divide them into "tranches" (divisions of risk) and sell them to investors. Banks could now make money multiple ways: originating mortgages, creating securitizations, earning fees selling MBS to investors, and trading securities. Securitization meant that loans could be resold on Wall Street, and mortgage origination became fee and volume driven.

14.    Mortgage securitization involves the conversion of illiquid whole loans into bond-like instruments that trade in capital markets. Mortgage loan "pass-through" securities entitle the investor to payments from pools of mortgage loans, i.e., when borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed through" to the investors.

15.    Mortgage-backed securities (MBS) are typically created by the originating lenders selling the mortgage loans to a "special purpose vehicle" ("SPV"). SPVs are typically US-style trusts established specifically to facilitate the securitization. The SPV may hold the mortgage on its balance sheet or place it in a separate trust.

16.    To transfer the pool of loans to a trust, the originating lender (called a "Seller" in MBS parlance) sells the loans to a Depositor, who then transfers – or "deposits" the acquired pool of loans to an "issuing trust."

17. Whether held by the SPV or sold into a trust, the rights to the cash flow are sold as bonds to investors, and the originating lender is paid off.

18. Mortgage securitization directly led to the "originate to distribute" model of mortgage lending, with originating lenders increasingly more concerned with generating loans to sell the mortgages for securitization than they were with selling borrowers loans they could actually afford. Originating lenders did not have to wait 30 years to be repaid; they were repaid almost before (and in some cases well before) the ink was dry on the contracts. The risk of default was effectively passed to the investors, who may or not have known the risks they were exposed to. Underwriting criteria – whether a borrower was qualified for a loan – simply ceased to matter. The problem is that no one bothered to warn the borrowers.

19. Waves of "innovation" in subprime lending lured borrowers into subprime (also now called "toxic") mortgages, which in turn fed the lucrative securitization machine. "Alt-A" loans were the moniker given to higher-end subprime mortgages. Other products promised the American Dream: adjustable-rate mortgages ("ARMS") with fabulous low-interest "teaser" initial rates and "pay option" mortgages where borrowers could choose to pay less than the monthly interest on their loan, so the principal would go up, not down. Lenders made money originating

loans; then, when the interest rates reset and borrowers couldn't afford the payments, they made money on re-financing.

**Consolidation and Growth of Top-Tier Financial Institutions**

20.   With the mortgage industry booming, large banks began acquiring subprime lenders. Among the top 25 subprime lenders, First Franklin was bought by National City and alter by Merrill Lynch; Long Beach Mortgage was bought by Washington Mutual; Household Finance was bought by HSBC; BNC Mortgage was bought by Lehman Brothers; Advanta was bought by JPMorgan Chase; Associates First Capital was bought by Citigroup; Encore Credit was bought by Bear Stearns; and American General Finance was bought by AIG.[4] Not only did the big banks want the fees generated by subprime mortgages, these mortgages would feed the banks' own securitization business.

21.   The wave of mergers consolidated economic and political power in a handful of megabanks, among them Citigroup, Bank of America, J.P. Morgan, Chase, First Union, and Wells Fargo. The passage of the Gramm-Leach-Bliley Act in 1999 meant that investment banking – including buying, selling, trading

---

[4] Simon Johnson, "13 Bankers," Id. at page 128, citing Alyssa Katz, Our Lot: How Real Estate Came to Own Us (New York: Bloomsbury, 2009), 70; Center for Public Integrity, Who's Behind the Financial Meltdown? The Top 25 Subprime Lenders and Their Wall Street Backers, available at http://www.publicintegrity.org/investigations/economic_meltdown/the_subprime_25/.

mortgage-backed securities – was now given a government bail-out guarantee previously only given to traditional banks.

22. The term "too big to fail" ("TBTF") refers to certain financial institutions that are so large and interconnected that they cannot be allowed to go into uncontrolled bankruptcy; defaulting on their obligations will create significant losses for other financial institutions, potentially triggering a domino effect that causes the entire financial system to collapse.[5]

23. What makes a financial institution too big to fail is the amount of collateral damage that its uncontrolled failure could cause. This damage can take several different forms. A failing institution could have thousands of open transactions with counterparties, which are largely other financial institutions.[6] A failing bank may have sold credit default swap ("CDS") protection on various securities; its counterparties are assuming that they are perfectly hedged because of those swaps.

---

[5] For example, the bankruptcy of Lehman Brothers ("Lehman") in September 2008 accelerated the collapse of American International Group ("AIG"), forcing it to rely on funds from the Federal Reserve. Lehman's failure also caused a sudden loss of confidence in all money market funds; in turn, the flood of money out of the money market funds cause the commercial paper market to freeze, thus endangering the ability of many corporations to operate on a day-to-day basis. The sequence of failures was only stopped by massive government rescue measures.

[6] For example, at the time of its collapse, the face value of AIG's open derivatives contracts was $2.7 trillion - $1 trillion of it was held by only twelve financial institutions.

However, when the bank fails, suddenly those hedges disappear and the counterparties are forced to take large losses on the underlying securities.

24. Beyond the collateral damage that large interconnected financial institutions inflict on the financial system, TBTF institutions create significant problems for society as a whole.

25. First, when TBTF institutions come to the brink of failure, they have to be bailed out, usually by the government (and taxpayers). A TBTF bank cannot be allowed to go into ordinary bankruptcy procedure because its creditors and counterparties would be cut off from their money supply for months, which could be fatal. This means that government must keep failing banks afloat and, without a credit threat of bankruptcy to negotiate with, must honor all of the bank's obligations; in other words, the money the bank lost has to be made up with public funds. This "hidden subsidy" has been calculated to be worth approximately $34 billion for 18 large banks in 2009, accounting for roughly half of their profits.[7]

26. All banks are highly leveraged, which means that they are betting with other people's money. There are many

---

[7] Simon Johnson and James Kwak, 13 Bankers, at p. 205, citing Dean Baker and Travis McArthur, "The Value of the 'Too Big to Fail' Big Bank Subsidy," Center for Economic and Policy Research Issue Brief, September 2009, available at http://www.cepr.net/documents/publications/too-big-to-fail-2009-09.pdf.

strategies – of which, securitization is the most popular – that increase returns for shareholders (and executives) while shifting potential losses onto someone else. TBTF institutions have a strong incentive to take excessive risk, since the government effectively guarantees their losses in an emergency. This sets up a situation where the market's checks and balances do not operate to curb excessive risk taking. Because creditors are aware that the government will not let these banks fail by guaranteeing their losses, they continue to invest.

27.   Arguably most significant problem for society is that TBTF banks stifle competition and therefore are bad for the economy.  Because large "megabanks" have an implicit government guarantee, bond investors are willing to lend them money at lower interest rates than offered to their smaller competitors. This subsidy makes it harder for smaller banks to compete, deterring new entrants and only strengthening the long-term process of consolidation and concentration in the financial sector. To wit, large banks paid .78 percentage points less for money than smaller banks in the wake of the financial crisis[8], resulting in a huge competitive advantage and consolidating their stranglehold on the economy.

28.   By 2008, the big banks became bigger. Bank of America bought Countrywide.  Merrill Lynch's assets grew from $1.7

---

[8] Simon Johnson, 13 Bankers, Id. at 205.

trillion to $2.3 trillion - from 2007 to 2009. JPMorgan Chase absorbed Bear Stearns and Washington Mutual grew from $1.6 to $2 trillion. JPMorgan Chase, Bank of America, and Wells Fargo had to be exempted from a federal rule prohibiting a single bank from holding more than 10% of all deposits in the U.S. They were also exempted from Dept. of Justice antitrust guidelines intended to limit monopoly power in specific metropolitan regions. By 2009, these three banks controlled half the market for new mortgages.[9]

29. At present, there are at least six banks that are considered too big to fail – Bank of America, Citigroup, Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo.   Of these six megabanks, four – Bank of America, Wells Fargo, Citigroup and JPMorgan Chase – maintain over 63% of the market share for mortgage originations.

### FACTS COMMON TO ALL CLAIMS

30. On March 26, 2007, Plaintiffs executed a promissory note (the "Promissory Note" or "Note") agreeing to pay $896,000.00 to First Magnus Financial Corporation (First Magnus) as "Lender".   On the same day, Plaintiffs entered into a mortgage (the "Mortgage") granting a security interest in real property located at 56 Kai La Place, #22B, Kihei, Hawaii, TMK# (2) 2-1-008-117 HPR: 0044 (the "Subject Property") to First

---

[9] Simon Johnson, 13 Bankers. Id., at 180.

Magnus.   The Mortgage document was recorded by or on behalf of First Magnus in the Office of the Assistant Registrar of the State of Hawaii on April 2, 2007, as Document No. 3582734, on Certificate No. 852,079, and is attached hereto as Exhibit 2.

31.   On or about June 15, 2007, Plaintiffs received a notice from Countrywide Home Loans ("Countrywide") that their loan was "recently transferred" from First Magnus to Countrywide.   A copy of the notice (Transfer Notice) is attached as Exhibit 3, and incorporated by reference.

32.   On February 7, 2011, an Assignment of Mortgage was executed by KEVIN A. DURHAM, purportedly in his capacity as Assistant Vice-President of MERS "solely as nominee" for First Magnus in which it purports to transfer to BANK OF NEW YORK MELLON, as trustee for the Trust, "all mortgagee interest under that certain Mortgage dated 3/26/2007 executed by John S. Cooper and Helena K. Cooper and Peter Malcolm Cooper, mortgagor, in favor of Mortgage Electronic Registration Systems, Inc., as nominee for First Magnus Financial Corporation as mortgagee, recorded as Document No. 3582734 on Transfer Certificate Title No. 852,709 on 4/2/2007 in the Office of the Assistant Registrar of the State of Hawaii …. Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage." The Assignment of Mortgage (the

"Assignment") was recorded in the Bureau of Conveyances on February 17, 2011, as Document No. 4050252, on Certificate No. 852,079, and is attached hereto as Exhibit 4.

33. On February 3, 2011, four days before the Assignment was executed, a Notice of Mortgagee's Intention to Foreclose Under Power of Sale ("Notice of Foreclosure") was issued by BONY as "Mortgagee," executed by Andrea R. Moreno, who claims to be an "authorized signatory," and acknowledged by A. Reza, a Notary Public, on February 3, 2011.

34. Plaintiffs submit that BANK OF NEW YORK MELLON does not have the legal authority to foreclose on Plaintiffs' property for at least the following reasons:

(a)    The documents demonstrate that there are or may be multiple parties expressing conflicting interests in the Promissory Note, Mortgage, and the Subject Property.

(b)    MERS has no financial interest in the Promissory Note or Mortgage. Its only function is to keep the security in its name to save those benefiting from the buying and selling of mortgages and mortgage-backed securities any recording fees and to keep the identity of the note holders hidden.

(c)    MERS did not have the legal authority to assign the mortgage or note to BONY because MERS was, at all times, acting "solely as a nominee" for First Magnus, BONY is not a valid

assignee of the Mortgage and, therefore, has no legal right to enforce the Mortgage.

(d)   On or about August 21, 2007, First Magnus filed for bankruptcy in the U.S. Bankruptcy Court for the District of Arizona, case number 4:07-bk-01578, and or about May 15, 2008, the U.S. Bankruptcy Court for the State of Arizona appointed a liquidation trustee for the affairs of First Magnus, and that liquidation trustee was empowered to make all business decisions for First Magnus from that time on, and that any authority MERS may have had with regard to First Magnus' interest in the mortgage terminated no later than May 15, 2008.   Plaintiffs request the Court take judicial notice of the First Magnus bankruptcy case.

(e)   The location of the Promissory Note is unknown. The original Note is believed to never have been delivered to subsequent purchasers but, rather, may have remained in the possession of Countrywide Homes thereby clouding any title claims that may arise in respect of the Note.

(f)   Even if this Court finds that MERS has the legal authority to assign a mortgage as nominee for First Magnus, Plaintiffs submit that the Mortgage was not assigned to BANK OF NEW YORK MELLON prior to the "Cut-Off Date" of the Trust, which was June 29, 2007, in breach of Section 2.01 of the PSA governing the Trust.   As such, the Mortgage was never validly

deposited into the Trust and never formed part of the assets of the Trust.

(g)     Even if this Court finds that MERS has the legal authority to assign a mortgage as nominee for First Magnus, such assignment did not take place until 4 days after BONY began foreclosure proceedings and, thus, BONY had no standing to foreclose at the time it instated foreclosure proceedings, consistent with the holding in *U.S. Bank N.A. v. Ibanez*, 941 N.E.2d 40, 52 (Mass. 2011).

(h)     If any of the Defendants or purported Note Holders are allowed to enforce the Note and Mortgage without producing the original with all endorsements and allonges showing that particular Defendant's authority to enforce the Note, along with proof of entitlement to payment (i.e., proof that the entity has not already been paid), Plaintiffs are in jeopardy of other individuals or entities appearing at a later date and claiming legitimate and legal entitlement to payment under the Note. This would result in double, or even exponential, liability for the Note.

**FACTS COMMON TO PLAINTIFFS' CLAIM FOR SLANDER OF TITLE, QUIET
TITLE, AND INJUNCTIVE RELIEF**

**MERS did not have legal authority to assign the Mortgage
and, therefore, BONY is not a valid assignee entitled to enforce
the Mortgage.**

35.  With reference to MERS's role in Plaintiffs' mortgage

loan transaction, the Mortgage states:

> MERS is a separate corporation that is
> acting solely as a nominee for Lender and
> Lender's successors and assigns.  MERS is
> the mortgagee under this Security Instrument
> (Mortgage, Exhibit 2, P. 1).

36.  The Mortgage also purports to contain a transfer to

MERS of Plaintiffs' rights in the Subject Property as follows:

> This Security Instrument secures to Lender:
> (i) the repayment of the Loan, and all
> renewals, extensions and modifications of
> the Note; and (ii) the performance of
> Borrower's covenants and agreements under
> this Security Instrument and the Note.  For
> this purpose, Borrower does hereby mortgage,
> grant and convey to MERS and to the
> successors and assigns of MERS, with power
> of sale, the [Subject Property].
>
> Borrower understands and agrees that **MERS
> holds only legal title to the interests
> granted by Borrower in this Security
> Instrument**, but, if necessary to comply with
> law or custom, MERS (as nominee for Lender
> and Lender's successors and assigns) has the
> right: to exercise any or all of those
> interests, including, but not limited to,
> the right to foreclose and sell the
> Property; and to take any action required of
> Lender including, but not limited to,
> releasing and cancelling this Security
> Instrument. (Exhibit 2, PP. 3-4) (emphasis
> added).

37.   The Assignment, dated February, 11 2011, and recorded February, 17 2011, as Document No. 4050252, on Certificate No. 852,079, references the Mortgage and states:

> FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. as nominee for First Magnus Financial Corporation, … hereby grants, assigns, and transfers to The Bank Of New York Mellon FKA the Bank of New York, as Trustee for the Certificateholders of the CWALT, Inc., Alternative Loan Trust 2007-HY6, Mortgage Pass-Through Certificates, Series 2007-HY6 … all mortgage interest under that certain Mortgage dated 3/26/2007 executed by John S. Cooper and Helena K. Cooper and Peter Malcolm Cooper, mortgagor, in favor of Mortgage Electronic Registration Systems, Inc., as nominee for First Magnus Financial Corporation, as mortgagee recorded as Document No. 3582734 on Transfer Certificate Title No. 852,079 on 4/2/2007 in the Office of the Assistant Registrar of the State of Hawaii ….
>
> **Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.** (Exhibit 4. Emphasis added.)

38.   Plaintiffs argue that MERS's "nominee" status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage or promissory note.

39.   In a 2006 published opinion, the New York Court of Appeals described the MERS system as follows:

> In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership

interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.

The initial MERS mortgage is recorded in the County Clerk's office with 'Mortgage Electronic Registration System, Inc.' named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage.

*Merscorp, Inc., v. Romaine*, 8 N.Y.3d 90 (N.Y. 2006) (footnotes omitted).

40. There is little to no case law in the State of Hawaii that interprets the role and legal status of MERS. Recently however, a New York Bankruptcy Court set forth a detailed analysis of the role of MERS because "MERS's role in the ownership and transfer of real property notes and mortgages is at issue in dozens of cases." *In re Agard*, 10-77338-reg, U.S. Bankruptcy Court for the Eastern District of New York (2011 Bankr. Lexis 488)Feb. 10, 2011). The Court stated that:

Other than naming MERS as "nominee", the
Mortgage also provides that the Borrower
transfers legal title to the subject
property to MERS, as the Lender's nominee,
and acknowledges MERS's rights to exercise
certain of the lender's right under state
law. This too, is insufficient to bestow
any authority upon MERS to assign the
mortgage. In Bank of New York v. Alderazi,
the court found "[t]he fact that the
borrower acknowledged and consented to MERS
acting as nominee of the lender has no
bearing on what specific powers and
authority the lender granted MERS."
Alderazi, 900 N.Y.S.2d at 824. Even if it
did bestow some authority upon MERS, the
court in Alderazi found that the mortgage
did not convey the specific right to assign
the mortgage.

41.  The Court concluded that naming MERS as "nominee" did

not bestow authority upon MERS to assign the mortgage. (*Agard*,

2011 WL 499959 at *20).

42.  In *LaSalle Bank, N.A. v. Bouloute*, 28 Misc. 3d

1227(A), 2010 WL 3559552 (N.Y. Sup. 2010), the Court analyzed

the relationship between MERS and the original lender and

concluded that a nominee possesses few or no legally enforceable

rights beyond those of a principal whom the nominee serves. The

Court further concluded that MERS must have some evidence of

authority to assign the mortgage in order for the assignment of

a mortgage by MERS to be effective. Evidence of MERS's

authority to assign could be by way of a power of attorney or

some document executed by the original lender (*See Bouloute*,

2010 WL 3559552, at *1-2).

43.   In *Agard*, MERS argued that it had authority to act as "agent" for each and every MERS member claiming ownership of a note and mortgage registered in its system.   This authority is purportedly based on the terms and conditions of a MERS membership agreement.   Those terms and conditions provide that "MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time." (Agard, 2011 WL 499959  at *18).

44.   Under Hawaii agency laws, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency § 1.01.*   Further, "[i]t is well established that '[a]n agency relationship may be created through actual or apparent authority.'" *State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Haw. 315, 325, 978 P.2d 753 (1999) (quoting *Cho Mark Oriental Food, Ltd. V. K & K Int'l*, 73 Haw. 509, 515-16, 836 P.2d 1057, 1061-62 (1992)).

45.   Actual authority exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by express agreement or implied from the conduct of

the parties or surrounding circumstances." *State Farm*, 90 Haw. At 325, 978 P.2d at 763 (quoting from *Cho Mark*, 73 Haw. At 515-16, 836 P.2d at 1061-62). Express actual authority "requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain things." *Cho Mark*, 73 Haw. At 515-16, 836 P.2d at 1061-62.

46.  Because of MERS members, the beneficial note holders, purported to bestow upon MERS interest in real property sufficient to authorize the assignments of mortgage, **the alleged agency relationship must be committed to writing by application of the statute of frauds**. The Hawaii Statute of Frauds states in relevant part that no action may be brought or maintained upon any contract for the sale of lands, tenements, or hereditaments, or of any interest in or concerning them unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is in writing, and is signed by the party to be charged therewith, or by some person thereunto by the party in writing lawfully authorized. HRS § 656-1.

47.  Plaintiffs submit that neither the Mortgage, nor any other document which has been provided to Plaintiffs, evidence an agency relationship between MERS and First Magnus. In the absence of such express authorization, Plaintiffs submit that the assignment of their Mortgage and Note by MERS to BONY was

not a valid assignment because MERS did not have the legal authority as mere "nominee" of Countrywide to make such an assignment. As a consequence, Plaintiffs further submit that BONY is not a valid assignee of his Mortgage and therefore does not have the legal authority to pursue foreclosure against the Subject Property.

**Neither First Magnus Nor Countrywide Effectively Transferred Plaintiffs' Original Note Thereby Ensuring a Clear Chain in Title to Plaintiffs' Mortgage**

48. An essential aspect of the mortgage securitization process is that the issuing trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or deed of trust). The rules that govern these transfers are contained in Hawaii's Uniform Commercial Code ("UCC") and the terms of the PSA (*Exhibit 1*).

49. The right to enforce a promissory note can be transferred only by physical delivery of the original note. Under section 3-301 of the "UCC", a "person entitled to enforce" an instrument means (with certain exceptions not relevant in

this case) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder." Thus, section 3-301 ties the enforcement right to possession of the paper.   Section 3-302(a) of the UCC provides that "an instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."   Under these sections, no one can enforce (and hence, no one can foreclose a mortgage secured by) a negotiable note unless the note has been delivered to that person.

50.   Section 2.01(c) of the PSA requires the Depositor to have delivered or cause to be delivered to the Trustee for the benefit of the Certificateholders, the documents and instruments with respect to each mortgage loan as assigned, including:

> (i) (A) the original Mortgage Note endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note); or
>
> (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note.

51.   Pursuant to the UCC (H.R.S. §§ 490:3-204) and Section 2.01(b) of the PSA, the promissory note and security instrument

(mortgage) must be transferred by endorsement (in the same way that a check may be transferred by endorsement) or by sale. Further, the UCC requires that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default (H.R.S. §§ 490:3-201-203).

52. Hawaii trust law generally requires strict compliance with trust documents, including the PSA. Failure to comply strictly with the timeliness, endorsement, physical delivery or other requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiffs Mortgage.

53. Plaintiffs are informed and believe that BONY claims its interest in the Mortgage based on a transfer from First Magnus to Countrywide, which then acting in its role as "Depositor," acknowledged transfer of the Mortgage into the Trust in Section 2.01 of the PSA.

54. Countrywide, however, routinely failed to comply with the requirements of the UCC and the PSA for valid transfer of Plaintiffs' (and others) Note and Mortgage to the Trust. In *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide Financial sought to prove that the Bank of New York, was trustee for a residential MBS issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce

the mortgage. Countrywide Financial presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing LP ("Countrywide Servicing") for approximately 10 years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing. Ms. DeMartini testified that, Countrywide Home originated Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but that Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer of the loan.

55. Even though DeMartini was presented by Countrywide Financial as a witness in an attempt to prove that the loan documents had been validly transferred to the issuing trust, her testimony, in fact, proved that the loan documents were never validly transferred. She testified that an allonge to the promissory note, which purported to transfer the note to the trust by endorsement, was prepared only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee. Indeed, she testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred.

56.   DeMartini also testified that the original note was retained by Countrywide and was never delivered to the trustee. Most significantly, she testified on direct examination that not delivering the original note to the trustee was Countrywide's standard business practice:

> Q.  Ms. DeMartini, is it generally the custom to – for your investor [*i.e.*, the issuing trust] to hold the documents?
>
> A.  No. They would stay with us as the servicer.
>
> Q.  And are documents ever transferred to the investor?
>
> A.  If we service-release them they would be transferred to whomever we're service-releasing them to.
>
> Q.  So I believe you testified Countrywide was the originator of this loan?
>
> A.  Yes.
>
> Q.  So Countrywide had possession of the documents from the outset?
>
> A.  Yes.
>
> Q.  And subsequently did Countrywide transfer these documents by assignment or an allonge?
>
> A.  Yes.
>
> Q.  And –
>
> A.  Well, transferred the rights, yes, transferred the ownership, not the physical documents.
>
> Q.  So the physical documents were retained within the corporate entity Countrywide or Bank of America?

A.   Correct.

Q.   Okay.  And would you say that this is
standard operating procedure in the mortgage
banking business?

A.   Yes.  It would be normal — the normal
course of business as the reason that we are
the servicer, as we're the ones that are
doing all the servicing, and that would
include retaining the documents.

57.   At   a   subsequent   hearing   in   September   2009,
Countrywide's counsel stated that:

> [A]lthough  …  the  UCC  and  the  Master
> Servicing  Agreement  apparently  requires
> that, procedure seems to indicate that they
> don't physically move documents from place
> to place because of the fear of loss and the
> trouble  involved  and  the  people  handling
> them.   They basically execute the necessary
> documents  and  retain  them  as  long  as
> servicing's  retained.   The  documents  only
> leave when servicing is released.

58.   Based  on  the  evidence  quoted  above,  Chief  Bankruptcy
Judge  Judith  H.  Wizmur  held  in  November  2010  that  the  Bank  of
New  York,  as  trustee  for  the  issuing  trust,  could  not  enforce
the mortgage loan for two reasons:

> First, under New Jersey's Uniform Commercial
> Code  ("UCC")  provisions,  the  fact  that  the
> owner  of  the  note,  the  Bank  of  New  York,
> never had possession of the note, is fatal
> to  its  enforcement.   Second,  upon  the  sale
> of  the  note  and  mortgage  to  the  Bank  of  New
> York,  the  fact  that  the  note  was  not
> properly  indorsed  to  the  new  owner  also
> defeats the enforceability of the note.
>
> *Kemp  v.  Countrywide  Home  Loans,  Inc.*,  No.
> 08-18700-JHW,  Slip  Op.,  at  *10-11  (Bkrtcy.
> D.N.J. Nov. 16, 2010)

**Plaintiffs' Mortgage was not deposited into the Trust before the cut-off date, which additionally invalidates the Assignment of Mortgage from Countrywide to the Trust.**

59.   Trust law generally requires strict compliance with trust documents, including the PSA.  Failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiff's Mortgage.

60.   Section 2.01(a) and (c) of the PSA governing the Trust into which Plaintiff's Promissory Note was purportedly entered, represents and warrants that:

> (a) … On or prior to the Closing Date [i.e., June 29, 2007] Countrywide shall deliver to [CWALT, Inc. as the Depositor] or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File [i.e., the mortgage documents listed in Section 2.01] for each Mortgage Loan listed in the Mortgage Loan Schedule … .

> (c)[CWALT, INC. as Depositor] has delivered or caused to be delivered to the Trustee … for the benefit of the Certificateholders, the documents and instruments with respect to each Mortgage Loan as assigned: (i)(A) the original Mortgage Note … or (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note.

> [To clarify terminology as used within the PSA: The term "mortgage" means deed of trust or other instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

"Mortgage Note" is defined as follows: The original
executed note or other evidence of indebtedness
evidencing the indebtedness of a Mortgagor under a
Mortgage Loan. It is also known as "promissory note,"
and is referred to by both names, as applicable,
herein.] PSA, at Definitions.[10]

61.   The PSA at Section 2.01 further represents and
warrants in relation to the assignment of a MERS Mortgage Loan
that:

[COUNTRYWIDE, as Seller] agrees that it will cause, at
the Trustee's expense, the MERS(R) System to indicate
that the Mortgage Loans sold by such Seller to the
Depositor have been assigned by that Seller to the
Trustee in accordance with this Agreement for the
benefit of the Certificateholders by including (or
deleting, in the case of Mortgage Loans which are
repurchased in accordance with this Agreement) in such
computer files the information required by the MERS(R)
System to identify the series of the Certificates
issued in connection with such Mortgage Loans.

62.   In other words, on or before the Closing Date (June
29, 2007), the original mortgage note must have been delivered
or caused to be delivered to the Trustee and COUNTRYWIDE must
provide written confirmation to the Trustee evidencing the
assignment of the Mortgage.

63.   Plaintiffs submit that neither the Note nor the
Mortgage was entered into the Trust in accordance with the terms
and conditions of the PSA.   Plaintiffs further allege that the
original Note never left the possession of Countrywide.   It is
the admitted practice of Countrywide to maintain possession of

---

[10] Id., Footnote 2.

the original Notes.    There is no evidence that a lost note affidavit was entered into Trust by the Closing Date.    In the absence of evidence to the contrary, Plaintiffs allege that neither the Note nor a valid lost note affidavit was deposited into the Trust prior to the Closing Date.

64.    With respect to the assignment of Plaintiffs' Mortgage, the evidence clearly indicates that the Mortgage was not assigned, if ever assigned at all, to the BANK OF NEW YORK until February 7, 2011; approximately **3-1/2 years after the Closing Date of the Trust.**    Plaintiffs submit that such retroactive assignment of the Mortgage is not permitted under the terms of the PSA, which makes clear that evidence of assignment must be provided, in written form, **no later than 30 days after the Closing Date (June 29, 2007).** Exhibit 1 at 2.01(c).

65.    The Defendants' failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the Assignment of Mortgage is void and the Trust does not have good title to Plaintiffs' Mortgage.

## LEGAL FRAMEWORK AND FACTS COMMON TO PLAINTIFF'S CLAIMS FOR VIOLATION OF FEDERAL AND HAWAII ANTI-TRUST STATUTES

66.    The substantive provisions of the Sherman, Clayton, and Federal Trade Commission Acts were incorporated verbatim

into Hawaii anti-trust law; therefore, interpretation of
Hawaii's anti-trust statutes is "in accordance with judicial
interpretations of similar federal antitrust statutes," and
courts may address the Federal and State claims together, rather
than separately. HRS § 480-3. See, e.g., *State v. Gannet Pac.
Corp.*, 99 F.Supp.2d 1241, 1248 n.7 (D. Haw. 1999) ("[T]he Court
need not address the sate law claims separately because they
essentially mirror the federal claims" of "restraint of trade,
conspiracy to monopolize, and attempted monopolization.")
(citing *Robert's Haw. Sch. Bus, Inc., v. Laupahoehoe Transp.
Co.*, 982 P.2d 853 (Haw. 1999), noting that the legislature
followed the "federal paradigm" in fashioning Hawaii antitrust
law.).

67. Any person injured in his business or property due to
a violation of the Hawaii Anti-Trust Act may sue for damages
under §480-13(a). Standing applies to consumers, and is not
limited to alleging commercial or competitive injury. The
essential elements of a private action under HRS 480-2 are: "(1)
a violation of Chapter 480; (2) injury to the plaintiffs'
business or property resulting from such violation; (3) proof of
the amount of damages; and (4) a showing that the action is in
the public interest or that the defendant is a merchant." *Ai v
Frank Huff-Agency*, 607 P.2d 1304, 1311 (Haw. 1980), overruled on

other grounds by *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, Id.

68. As to the fourth element, Plaintiffs submit that the named Defendants are both "merchants" and also that this claim is brought in the public interest.

> "[T]o justify filing a complaint the public interest must be specific and substantial. Often it is so, because the unfair method employed threatens the existence of present or potential competition. **Sometimes, because the unfair method is being employed under circumstances which involve flagrant oppression of the weak by the strong.** Sometimes, because, although the aggregate of the loss entailed may be so serious and widespread as to make the mater one of public consequence, no private suit would be brought to stop the unfair conduct, since the loss to each of the individuals affected is too small to warrant it." *Ai*, Id. at 1310, quoting *FTC v. Klesner*, 280 U.S. 19, 28 (1929).

69. Hawaii Courts have followed Federal law when defining the terms "unfair" and "deceptive" in HRS §480-2.

> "A practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Dubin v. Wakuzawa, 970 P.2d 496, 505 (Haw. 1999)(quoting Eastern Star, Inc. v. Union Bldg. Materials Corp., 712 P.2d 1148, 1154 (Haw. 1985) (quoting Rosa v. Johnson, 651 P.2d 1228, 1234 (Haw. Ct. App. 1982)); Spiegel, Inc., v. FTC, 540 F.2d 287, 293 (7th Cir. 1976)).

> Deception is "an act causing as a natural and probable result, a person to do that which he would not otherwise do." Dubin v. Wakuzawa, Id. at 505, (quoting Eastern Star, Inc., Id. (citing Bockenstette v. FTC, 134 F.2d 369 (10th Cir. 1943)). See also Hawaii Comty. Fed. Credit Union v. Keka, 11 P.3d 1, 16-17 (Haw. 2000).

70.   Deceptive acts or practices are distinct from unfair acts or practices, both in how they are defined and in the standard by which they are proved. *State v. United States Steel Corp*, 919 P.2d 294, 313 (Haw. 1996). Actual deception need not be show; the capacity to deceive is sufficient. Eastern Star, Inc., 712 P.2d at 1154(citing Goodman v. FTC, 244 F.2d 584 (9th Cir. 1957)); see also Hawaii Comty. Fed. Credit Union, Id.; Dubin, Id., citing Eastern Star, Inc., Id.).

71.   Monopolization is prohibited by HRS § 480-9, which is taken from the Sherman Act, 15 U.S.C. § 2. The Hawaii Supreme Court, in *Island Tobacco I,* stated: "The offence of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Island Tobacco Co. v. R.J. Reynolds Tobacco Co., 627 P.2d 260, 274 (Haw. 1981) (quoting U.S. v. Grinnell Corp., 384 U.S. 563, 570-571, overruled on other grounds by Robert's Haw.Sch.Bus, Inc., v. Laupahoehoe Transp. Co., Id.).

72.   In *Island Tobacco II,* the Federal court identified the elements of an "Attempt to monopolize" claim as involving "(1) a specific intent to control prices or destroy competition with

respect to a part of commerce; (2) predatory conduct directed toward accomplishing the unlawful purpose; (3) a dangerous probability of success." Below-cost pricing may prove the specific intent and dangerous probability of success elements. Island Tobacco Co. V. R.J. Reynolds, 513 F.Supp. 726 (D. Haw. 1981).

### CLAIM 1
### VIOLATION OF SHERMAN AND CLAYTON ANTI-TRUST STATUTES
### (Against BONY and MERS)

73. Common residential lending scenarios involve two parties to a real property mortgage – a mortgagee, i.e., a lender, and a mortgagor, i.e., a borrower.  In effect the MERS system was designed to circumvent and, as envisioned by its originators replace, the traditional system of public recordation of mortgages. Some jurisdictions have enacted statutes authorizing MERS's authority to register itself as "mortgagee or record," but Hawaii has enacted no such statute.

74. Plaintiffs, upon information and belief, and on that basis allege that the COUNTRWIDE DEFENDANTS and BANK OF AMERICA, along with six large private banking institutions operating within the United States sued as DOES 1-6 (collectively "the Big Six"), agreed, beginning in or about 1994, to a scheme by which they would and did set up a private system of recording interests in land in the United States, that would give them a competitive advantage over smaller banking institutions,

effectively fixing prices by enabling these megabanks to transfer mortgage loans quickly into securitized pools of like mortgages; this system became Defendant MERS.

75. Further, Plaintiffs, upon information and belief, and on that basis allege that subsequent to the creation of MERS, the Big Six used their combined market power in the financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are serviced either by the Big Six, and held in trust by either the Big Six, or a selected few institutions who knew of and acquiesced to the actions of the Big Six, one of which is BONY.

76. Further, Plaintiffs, upon information and belief and on that basis allege that subsequent to the creation of MERS, the Big Six were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually "shut out" from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Six, such that those institutions are denied the benefits of the

interest generated by such mortgages and the income generated from servicing those mortgages.

77. Plaintiffs, upon further information and belief and on that basis allege that subsequent to the creation of MERS, smaller banking institutions in the United States have been forced out of the residential lending market, and instead were forced to engage in much more speculative forms of lending, such as construction and development loans to builders, and small to medium sized commercial and industrial real estate loans.

78. Plaintiffs, upon further information and belief and on that basis allege that subsequent to the creation of MERS, the Big Six and MERS used their control over the residential mortgage market by inflating the market for residential properties in the United States and thereby increasing the proportionally based fees that such larger loans would generate.

79. Such inflation manifested itself in a complete inversion of the order of mortgage loan creation and securitization. The Big Six's desire for more profit led to a system in which a security instrument would be created and marketed to investors prior to any loan being originated. The security would be tailored to consist of mortgages of certain specified sizes, features, and risk levels. It would be only after the security was sold to investors with "place holder" and "bogus" assets that the Big Six would send out "orders" for

mortgage loans that met the criteria set forth in the security's prospectus.

80. The "orders" would then be transmitted to loan originators, whether they were units or subsidiaries the Big Six or independent brokers. The originators would be "encouraged" to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized.

81. The originators would then be under pressure to make such loans to their customers, regardless of the customers' needs. Given that the Big Six virtually controlled the market in loans, those originators would steer customers toward those loans, and either fail to mention or steer customers away from loans that might be otherwise more appropriate.

82. Because larger loans generated larger fees, the originators would steer customers toward larger loans, whether or not such larger loans were within the customers' means or best interests.

83. In order to facilitate the granting of larger loans, the Big Six developed loan products that did not depend on proof of a borrower's income, but rather depended on the value of the real property secured by the loans.

84. In order to justify the granting of larger loans, pressure was brought to bear upon property appraisers: those who

would not "hit the number" (appraise a property at a value that the lender wanted to lend) would not be given further business.

85.   As the result of the acts described above, the Big Six were able to increase the size of loans they made, bought, and securitized, allowing them to take their gains and redeploy them into even larger securities, and in the process were able to inflate the prices of residential real property to a point where they were far beyond the means of the purchasers to whom they were readily giving loans, according to the lending standards they themselves had developed and used for decades.

86.   Plaintiffs, upon further information and belief and on that basis allege that the Big Six knew that such a business that depended upon ever increasing real estate values was unsustainable, and purposely created and used MERS to serve as a "firewall" between themselves, the loan originators, and the borrowers they were routinely pulling into unsustainable debt.

87.   Plaintiffs, upon further information and belief and on that basis allege that the Big Six also depended upon MERS to give them a quick and efficient way of rationalizing the interests they would need to secure interests in the real property, whether or not such rationalizations reflected the true relationship between lender and borrower, once their scheme of inflating prices reached its natural and inevitable point of

saturation, real estate prices began to fall, and borrowers fell into financial distress.

88. Plaintiffs, upon further information and belief and on that basis allege that the Big Six also created securities generally known as credit default swaps (CDSs), in which they took positions against the mortgage securities they created, in effect betting against the very home loan borrowers they had sought to entice into loans on constantly appreciating residential real property, knowing that those borrowers would eventually be unable to meet those inflated obligations that the Big Six had endeavored to create.

89. Plaintiffs upon further information and belief and on that basis allege that First Magnus and Countrywide (a) knew of and acquiesced to the creation of MERS by the Big Six, and actively used MERS to facilitate the creation of its own mortgage loan securities; and (b) knew of the acts of the Big Six described above in inflating the mortgage market, and knowingly and willfully accepted the benefits of such an inflated market in the form of increased fees for servicing residential mortgage loans and residential mortgage securities.

90. Plaintiffs, upon further information and belief and on that basis allege that First Magnus agreed to include MERS as mortgagee and "nominee" for the Mortgage as part of an agreement between First Magnus as a "member" of MERS, MERS itself, and the

Big Six, sued here as DOES 1-6, inclusive, to (a) protect and
insulate First Magnus from otherwise valid claims and defenses
by mortgagors and borrowers by providing an intermediary in the
transaction; (b) provide a conduit for the securitization, and
exclusive access to the business of servicing securitized
mortgage loans and DOE Defendants 1-6; and (c) eliminate
competition in the real residential loan industry in that
consumers are offered only loans that conform to the preset
parameters of securitization pools, and cannot obtain loans that
more closely fit their particular needs.

91. Plaintiffs, upon information and belief and on that
basis allege that BONY (a) knew of and acquiesced to the
creation of MERS by the Big Six; and (b) knew of the acts of the
Big Six described above in inflating the mortgage market, and
knowingly and willfully accepted the benefits of such an
inflated market in the form of fees for serving as Trustee for
residential mortgage securities, to the exclusion of other
institutions that were qualified to and would have served as
such trustees.

92. As the result of the conduct of the Defendants set
forth above, Plaintiffs have been damaged, in that they have
been subject to the imposition of artificially high mortgage
rates and fees for mortgage servicing, without any meaningful
choice, and without any opportunity to bargain for more

advantageous fees, such fees being added to any balance due to the mortgagee in the event of default, all inconsistent with a system of free and fair trade guaranteed to all persons, and the restraint of which is prohibited by the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2, and the Clayton Anti-Trust Act, 15 U.S.C. § 15 et seq.

93.   Section 4 of the Clayton Antitrust Act, codified at 15 U.S.C. §15, provides as follows:

> [A]ny person who shall be injured in their business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fees.

94.   Plaintiffs allege they are injured in their property as set forth above, and are, therefore, entitled to bring an action against Defendants for Defendants' actions complained of above.

95.   As a direct and proximate result of one or more of the unlawful acts and/or omissions of Defendants, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs have suffered pecuniary damages in an amount to be determined, and subject to treble augmentation.

96.   Plaintiffs have also been required to retain legal counsel and, therefore, request that the Defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to 15 U.S.C. §15.

## CLAIM 2
## VIOLATIONS OF THE HAWAII ANTI-TRUST AND UNFAIR PRACTICES ACTS
### (Against BONY and MERS)

97.   Each and every allegation contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

98.   The conduct of Defendants BONY and MERS, and each of them, as described more fully above, violates HRS § 480-2 by using unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade or commerce. Plaintiff alleges Defendants' conduct is a violation of the Hawaii Monopolization Act, HRS § 480-9, being a monopoly or an attempt to monopolize.

99.   Defendants' qualification of Plaintiffs for a loan they could not afford, sale of said loan to Plaintiffs, electronic registration of the Subject Mortgage, and other activities related to the origination and management of Plaintiffs' mortgage loan, as described here, were accomplished with the intent to destroy the competition in the mortgage lending industry in Hawaii in violation of HRS § 481 by undercutting the prices that competitors could offer due to

these entities' market size, strength, and use of predatory lending practices, including use of inflated appraisals that effectively trapped unsophisticated borrowers (consumers) in loans from which they could not extricate themselves, unless they refinanced, which generated a second round of profits for Defendants.

100. As a direct and proximate result of one or more of the unlawful acts and/or omissions of Defendants, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs have suffered pecuniary damages in an amount to be determined at trial.

101. Plaintiffs were required to retain legal counsel and, therefore, request that Defendants BONY and MERS, and each of them, be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

## CLAIM 3
### SLANDER OF TITLE
### (Against BONY, MERS, and MAX DEFAULT)

102. Each and every allegation contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

103. Historically, a note and mortgage generally were inseparable. Every time a loan secured by a mortgage was sold,

the assignee was required to record the assignment to protect its security interest. The MERS system caused this traditional system to be radically altered. While the promissory notes may be transferred many times between multiple MERS members, the mortgage remains held by MERS as "mortgagee of record." The very operation of the MERS system results in the promissory note and mortgage being split. Plaintiffs submit that MERS is not a party to the Promissory Note underlying the Mortgage and has no authority to take any action with respect to the Note. See Exhibit 2.

104. On or about February 17, 2011, Defendants Max Default and MERS, without privilege, caused to be recorded with the Assistant Registrar of the State of Hawaii as Document No. 4050252, on Certificate No. 852,079, a document called an "Assignment," which purports to transfer the Mortgage from MERS, as nominee for First Magnus, to THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2007-HY6, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-HY6. Said Assignment purports to assign the underlying Promissory Note as well. Exhibit 4.

105. Also on February 17, 2011, Defendants Max Default and BONY, without privilege, caused to be recorded with the with State of Hawaii Bureau of Conveyances as Document No. 2011-021552, a Notice of Mortgagee's Intent to Foreclose Under Power

of Sale (the "NOF").  A copy of the NOF is attached, marked Exhibit 5, and incorporated by reference.

106. Plaintiffs submit that the Mortgage, because it has become separated from the promissory note it secures either upon the Mortgage's entry into the MERS system, or thereafter, has become unenforceable.

107. Plaintiffs allege that the Mortgage does not grant legal authority to MERS and to assign a valid and enforceable interest in the Subject Mortgage; therefore, the MERS assignment is fraudulent or void, and thus the Assignment in that it purports to convey an interest in the Subject Property which the grantor did not possess, and the grantee therefore did not obtain, is false.

108. Plaintiffs further allege that because MERS does not have legal authority to assign the Mortgage or Note, Defendant BONY is not a bona fide holder of a valid security interest in the Property, and the NOF, in that it gives the impression that the BONY has the an interest in the property when it does not, is false.

109. The recording of the Assignment by MERS and Max Default, as nominee for First Magnus, and the recording of the NOF by BONY, Max Default directly impairs the vendibility of the property by rendering Plaintiffs' title unmarketable in an amount to be determined at trial.

110. The recording of the documents made it necessary for Plaintiffs to retain legal counsel and bring this action to cancel the instrument, casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to attorney's fees and costs incurred in cancelling the instruments.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this Complaint to state such amount when the same becomes known.

111. The aforementioned record was motivated by fraud and malice, in that Defendants BONY, MAX DEFAULT and MERS knew or should have known that the assignment was false, because MERS had no authority to assign the Mortgage.  Such action warrants an award of exemplary damages in an amount to be determined at time of trial.

## CLAIM 4
## UNFAIR AND DECEPTIVE ACTS OR PRACTICES
### (Against BONY)

112. Each and every allegation contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

113. BONY has engaged in Unfair and Deceptive Acts or Trade Practices (UDAPs), in violation of HRS §481A-3, in that it has represented, by way of documents placed in the public record that (a) it the Mortgagee on the Subject Property, when such fact is not true; and (b) it intends to foreclose upon the

Subject Property pursuant to a power of sale it does not possess.

114. As the result of BONY's acts as described above, Plaintiffs have been, and continue to be damaged in that their title to the Subject Property has been placed in doubt and rendered unmarketable, and the value of their investment in the Subject Property reduced in an amount to be established at trial.

115. As a further proximate result of BONY's actions as described above, Plaintiffs, upon information and belief and on that basis allege that they will suffer general damages from impairment of their respective credit ratings, in an amount to be determined at trial.

116. Plaintiffs are, therefore, in addition to any other relief sought, entitled to an order enjoining BONY from conducting a foreclosure sale of the Subject Property pursuant to a claimed power of sale under the Mortgage, pursuant to HRS §481A-4.

## CLAIM 5
## QUIET TITLE
### (Against All Defendants)

117. Plaintiff incorporates all of the preceding paragraphs of this complaint as if set forth in full here.

118. At the time the loan closed on March 26, 2007 the Note gave First Magnus, then the Lender and originator, the right to

payments. The terms of the Note state that the only one who takes the Note by transfer, and who is entitled to receive payments is the Note Holder.

119. Plaintiffs have a Warranty Deed on the Property, and have a claim to the Property superior to all others.

120. Trust law generally requires strict compliance with trust documents, including the PSA. Failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiffs' Mortgage.

121. Section 2.01(a) and (c) of the PSA governing the Trust into which Plaintiffs' Promissory Note was purportedly entered, represents and warrants that:

> (a) … On or prior to the Closing Date [i.e., June 29, 2007] Countrywide shall deliver to [CWALT, Inc. as the Depositor] or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File [i.e., the mortgage documents listed in Section 2.01] for each Mortgage Loan listed in the Mortgage Loan Schedule … .

> (c) [CWALT, INC. as Depositor] has delivered or caused to be delivered to the Trustee … for the benefit of the Certificateholders, the documents and instruments with respect to each Mortgage Loan as assigned: (i)(A) the original Mortgage Note … or (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note.

[To clarify terminology as used within the PSA: The term "mortgage" means deed of trust or other instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

"Mortgage Note" is defined as follows: The original executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan. It is also known as "promissory note," and is referred to by both names, as applicable, herein.] PSA, at Definitions.[11]

122. The PSA at Section 2.01 further represents and warrants in relation to the assignment of a MERS Mortgage Loan that:

[COUNTRYWIDE, as Seller] agrees that it will cause, at the Trustee's expense, the MERS(R) System to indicate that the Mortgage Loans sold by such Seller to the Depositor have been assigned by that Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files the information required by the MERS(R) System to identify the series of the Certificates issued in connection with such Mortgage Loans.

123. In other words, on or before the Closing Date (June 29, 2007), the original mortgage note must have been delivered or caused to be delivered to the Trustee and Countrywide must provide written confirmation to the Trustee evidencing the assignment of the Mortgage.

124. Plaintiffs submit that neither the Note nor the Mortgage was entered into the Trust in accordance with the terms

---

[11] Id., Footnote 2.

and conditions of the PSA.  It is the admitted practice of Countrywide to maintain possession of the original Notes. Plaintiff further alleges that Countrywide, in that it was a major "player" in the mortgage industry, generally defined and prescribed by example the practices followed by other lenders, and that the original Note never left the possession of Countrywide, and likely never left the possession of First Magnus following Countrywide's practice.  There is no evidence that a lost note affidavit was entered into Trust by the Closing Date.  In the absence of evidence to the contrary, Plaintiffs allege that neither the Note nor a valid lost note affidavit was deposited into the Trust prior to the Closing Date.

125. With respect to the assignment of Plaintiffs' Mortgage, the evidence clearly indicates that the Mortgage was not assigned to the BONY until February 7, 2011; approximately **3-1/2 years after the Closing Date of the Trust.**  Plaintiffs submit that such retroactive assignment of the Mortgage is not permitted under the terms of the PSA, which makes clear that evidence of assignment must be provided, in written form, **no later than 30 days after the Closing Date (June 29, 2007).** Exhibit 1 at 2.01(c).

126. After default, numerous parties have come forward, attempting to demonstrate an entitlement to the Property or entitlement to foreclose, through a claimed interest as nominee,

agent, purported Note Holder, or other undeclared, unspecified interest.

127. As fully detailed hereinabove, those parties claiming interest are the Defendants identified in this claim. The defective and void nature of these entities' claims to the Property has been set forth. Each Defendant has actual knowledge of the defects in the recorded chain of title and in the purported transfer(s) of the Note. Each Defendant has contributed to the cloud currently existing on title to the Property.

128. Plaintiffs have been given conflicting information about the holder of the Note. Upon information and belief, the Note originally was held by First Magnus and Plaintiffs are unaware of any valid transfer of said Note.

129. BONY purports to be the party entitled to enforce the Note through foreclosure. However, Plaintiffs have no knowledge of, and no way to determine outside discovery in this lawsuit, who is the legal Note Holder, who is entitled to payment, if anyone, whether the Note still exists, and whether it has been paid by Federal insurance or other means.

130. Plaintiffs are in jeopardy, because the true holder of the Note, as well as third parties, could come forward claiming an unsatisfied interest in the Note, and may or may note be subject to Plaintiffs' various affirmative defenses and

counterclaims. Plaintiffs are entitled to proof of the true holder of the Note to avoid this imminent danger.

131. As to the Mortgage which secures the Note, at the time that the Mortgage was recorded in the name of MERS, the Mortgage and Note became separated, with the Note being retained by First Magnus. Plaintiffs believe that the Mortgage and Note have remained separated ever since.

132. The Assignment of Mortgage, absent a legal transfer of the underlying debt (Note), transfers nothing. As detailed above, MERS' Assignment of Mortgage is not a valid transfer of the Mortgage or Note.

133. Various Defendants have filed documents in the Hawaii Bureau of Conveyances against the Property, without the legal authority to do so. Those documents include, but are not limited to the Assignment of Mortgage and the Notice of Foreclosure Under Power of Sale.

134. Further, upon information and belief, through payments from Plaintiffs, insurance coverage, or other methods, any party with a valid claim to payment under the Note may have already been paid.

135. Plaintiffs are entitled to an order from this Court that the Plaintiffs' estate in the Property is established to them, that title be quieted in their names, that all illegally recorded documents be declared null and void with filings at the

Hawaii Bureau of Conveyances to that effect, and that all Defendants be barred and estopped from having or claiming any right or title to the Property, adverse to the Plaintiffs, and that the Mortgage be released by a recording at the Hawaii Bureau of Conveyances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, as follows:

a. For an order enjoining Defendant THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2007-HY6, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-HY6, from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all of the parties to this action;

b. Awarding compensatory and/or recessionary damages in favor of Plaintiffs and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding statutory damages in such amounts as shall be established at the time of trial;

d. Awarding punitive or exemplary damages to Plaintiffs according to proof;

e. Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

f. For such other relief as this Court deems just and equitable.